BOON EDAM, INC., Appellant/Cross–Appellee,

v.

Evelyn SAUNDERS, Appellee/Cross–Appellant.

Nos. 2008–CA–001606–MR, 2008–CA–001780–MR.

Court of Appeals of Kentucky.

Oct. 15, 2010.

Michael J. Farrell, Allison N. Carroll, Huntington, WV, for appellant/cross-appellee.

Wendell S. Roberts, Donald R. Yates, II, Ashland, KY, for appellee/cross-appellant.

Before ACREE, CAPERTON, and THOMPSON, Judges.

## OPINION

CAPERTON, Judge:

Boon Edam, Inc. appeals from a judgment awarding $629,602.09 to Evelyn Saunders for damages arising from injuries sustained when a Boon Edam revolving door struck Saunders, causing her to fall and sustain injuries. Following the products liability trial, the jury found Boon Edam's door was unreasonably dangerous for use, i.e., that the door design was defective. On appeal, Boon Edam argues that the judgment should be reversed because: (1) the trial court erred in allowing Saunders' expert witness to testify; (2) the evidence presented was not competent to establish that the door was in a defective condition and unreasonably dangerous and, thus, Boon Edam's motion for directed verdict should have been sustained; and (3) there was a dearth of evidence to support an award for future pain and suffering and, thus, the issue should not have been included in the jury instructions. Saunders denies the validity of Boon Edam's arguments and argues instead that the trial court erred in granting summary judgment for Boon Edam on Saunders' claim for inadequate warning. After a thorough review of the parties' arguments, the record, and the applicable law, we affirm the judgment of the Boyd Circuit Court entered of record on February 21, 2008.

The facts in the matter *sub judice* were testified to at a multiple-day jury trial. Evelyn Saunders [1] testified that on October 7, 2003, she drove her husband, Glen, to the King's Daughters Medical Center (KDMC) in Ashland, Kentucky, for treatment. Located at the main entrance to KDMC was an automatic revolving door manufactured in the year 2000 by Boon Edam. When Saunders attempted to enter the door, she was knocked down by the door and fell on her right hip.[2] Saunders

---

1. The Saunders were both over the age of 70.

2. In addition to Saunders' testimony, three eyewitnesses testified to the events. Leon May testified that as Saunders was entering

suffered a broken femur, required hip surgery, and incurred medical expenses of $29,602.09. Saunders and her treating physician, Dr. Goodwin, both testified as to her level of pain after the incident which continued through the day of trial.

After Saunders' incident, KDMC closed off the door and the panels were removed and stored at KDMC. On February 22, 2006, the parties, in presence of their counsel, examined the door panels at KDMC. A Boon Edam employee turned on the power to the door and its top-rail sensors.[3] Robert Baughman, vice president of technical services for a then defendant architectural firm, examined the leading edge of each of the door's three panels to determine the limits of the zones of detection of the top-rail sensors. Baughman tested the limits of the top-rail sensor by moving his hand along the door and discovered a "dead zone." Baughman testified that the top-rail sensors did not completely cover the leading edge of the panel, leaving a "dead zone" in front of the leading edge of each of the door panels where there was no presence-detecting sensor coverage.[4]

Saunders presented her witness, Dr. Warren Davis[5] an expert in sensors as used on the Boon Edam TQA-model door. Dr. Davis testified extensively about his education and professional experience with automatic doors and presence-detecting sensors. Dr. Davis reviewed all pertinent discovery including depositions and the manuals for the TQA door, in addition to visually inspecting the door panels and reviewing the videotape of the testing of the door by Baughman.[6]

the door one of the panels struck her and that she never made it inside the door. May further testified that Saunders did nothing inappropriate as she entered the door and did not walk into the door's panels. The second eyewitness, Ann Williamson, testified in accord with May's version of events. The third eyewitness, Glen Saunders, also testified in accord with the aforementioned events.

3. The Boon Edam automatic revolving door at KDMC was a "TQA" model. It was cylindrical and comprised of three heavy metal and glass panels which rotate counterclockwise around a central axis and divide the door into three compartments. The manual provided by Boon Edam states that the door's panels should stop at least eight to twelve inches away from someone using the door and at no point should make contact with the door user. Each of the door's panels has an infrared presence-detecting top-rail sensor mounted in the center of the metal frame, located at the top of the panel, for the purpose of detecting a person who has fully entered one of the door's compartments in order to signal the door panels to stop moving before hitting the person.

4. Baughman's discovery of a dead zone included the front area immediately before all three doors. Baughman's testing was videotaped by a court reporter and photographed.

5. Boon Edam filed a *Daubert* (*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)) motion to exclude Dr. Davis's testimony. At the *Daubert* hearing, Dr. Davis testified to his qualifications. He holds a B.S. and Ph.D. in physics from the Massachusetts Institute of Technology and has also substantially completed the credits necessary for a degree in electrical engineering. After hearing Dr. Davis's extensive qualifications, the trial court denied Boon Edam's *Daubert* motion.

6. Dr. Davis reviewed the investigation of the door performed by Baughman and testified that the dead zone extended the entire length of the leading edge of each door, covering an area of some eight feet along the edge of each door and about eight inches out from each door. Dr. Davis testified that he had inspected and tested other models of Boon Edam automatic revolving doors and those manufactured by Besam, Inc., a Boon Edam competitor, both equipped with presence-detecting sensors that covered the leading edge of the door panels, which were not present on the TQA model. Dr. Davis further testified that when a revolving door was equipped with sensors that covered the leading edge of the door panel, they would stop the door panels from striking a user.

Based upon his education, training, experience, and the materials he reviewed, Dr. Davis informed the jury that Boon Edam's TQA door failed to detect Evelyn's presence as she entered the door because the detection zones of its top-rail sensors did not cover the leading edge of the door panels, and the TQA-model was not equipped with any additional presence-detecting sensors that would prevent such an accident.[7]

Dr. Davis then testified that when Boon Edam built the TQA door in 2000, there were three types of sensors[8] in existence which could have been used by Boon Edam, and that the sensors were alternative and feasible designs that would have provided coverage for the leading edge of the door panels. All three sensor types had existed since the mid–1990s, and have been used in the automatic revolving door industry to cover the leading edge of revolving door panels. Dr. Davis testified that they could have been used in the TQA model. Dr. Davis testified that Boon Edam's competitor, Besam, Inc. used infrared and capacitive field sensors on its automatic revolving doors and that other models of Boon Edam doors utilize infrared sensors that cover the leading edge of the door panels.[9]

Dr. Davis also testified that the leading edge of a panel of an automatic revolving door is the part of the door with the highest velocity. A person hit by one of the door panels would be, in effect, subjected to the combined force of all three moving door panels.

Dr. Davis next testified that the American National Standards Institute (ANSI) standard applicable to automatic doors is a minimum performance guideline issued by the automatic door industry through a group of manufacturers. In 2000, when the TQA door was built, there were no applicable ANSI guidelines for automatic doors. Three years later, the first ANSI guidelines for automatic doors were published. Dr. Davis testified that when these first ANSI guidelines were published, they were drafted so that all doors in existence prior to 2003 would meet the guidelines.

Boon Edam presented two witnesses: Kurt Measom, a Boon Edam employee, and Michael Livernois, Boon Edam's expert. Livernois testified that it was impossible for one of the TQA door panels to have struck Evelyn and stated that the eyewitnesses to the incident must have been mistaken because Evelyn must have walked into the door. Livernois disputed the feasibility of including capacitive field and ultrasound sensors on the TQA door, but did not dispute the inclusion of additional infrared sensors.

Boon Edam presents three arguments on appeal which it claims require reversal of the judgment. First, Boon Edam argues that the trial court abused its discretion by allowing Dr. Warren Davis to testify.[10] Second, Boon Edam argues that it

---

7. Dr. Davis also testified that Boon Edam's TQA door was defectively designed because its sensor system failed to include sensors that provided coverage of the leading edge of the door; that Evelyn would not have been hit by the door if said door was equipped with sensors that provided leading edge coverage; and that the design of the TQA door was unreasonably dangerous because of its defectively designed sensor system. Boon Edam did not object to this testimony.

8. Infrared, ultrasound, and capacitive field.

9. Dr. Davis also testified that the cost of installing additional infrared sensors to provide leading edge coverage on the TQA door was negligible.

10. In support thereof, Boon Edam additionally argues that Dr. Davis's expertise did not fit the unreliable design testimony he provided; that his testimony was not based on sufficient fact or data; was not the product of reliable

was entitled to a directed verdict because Saunders failed to present any competent evidence that the TQA door was in a defective condition unreasonably dangerous and that the trial court erred in failing to grant the directed verdict motion based upon the statutory presumption of non-defectiveness established by KRS 411.310(2). Third, Boon Edam argues that Saunders failed to present any evidence to support an award of future pain and suffering.

Saunders counter-argues that the trial court did not err in allowing Davis to testify; that the jury verdict was supported by substantial evidence; that the trial court correctly denied Boon Edam's directed verdict motion; and that Boon Edam failed to preserve for appeal its contentions that there was no evidence to support an award of damages for future pain and suffering. In addition, Saunders argues that the trial court erred by granting summary judgment for Boon Edam on Saunders' claim for inadequate warning.[11] With these arguments in mind, we now turn to Boon Edam's first claimed error that the trial court abused its discretion by allowing Dr. Warren Davis to testify.

The admission of expert testimony is provided for under Kentucky Rules of Evidence (KRE) 702, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. . . .

■ In addition, the case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), established standards for the admission of expert testimony which have been adopted in Kentucky. *Miller v. Eldridge,* 146 S.W.3d 909, 913 (Ky.2004). In discharging its gatekeeper function, the trial court must assess whether the reasoning and methodology underlying the proposed scientific testimony is valid and whether the application of that reasoning and methodology is relevant to the facts at issue. *Id.* at 913–914. *Daubert* set forth certain factors that a trial court may consider when evaluating the reliability of scientific testimony:

> (1) whether a theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether, with respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific, technical, or other specialized community.

*Id.* at 914.

These *Daubert* factors do not constitute an exclusive list. *Id.* Moreover, the factors may not even be pertinent given the specific circumstances of a particular case because the gatekeeper function must be "tied to the facts." *Miller* at 918.

■ We review a trial court's ruling on whether to admit expert testimony under the abuse of discretion standard. *Goodyear Tire and Rubber Co. v. Thomp-*

---

principles or methods; and that he did not apply the principles and methodologies reliable to the facts of the case.

**11.** Because we do not find any error in the judgment rendered by the jury, we decline to address the merits of the cross-appeal termed

by Saunders as a "protective" cross-appeal, which was presented to this Court as alternative grounds for reversal if this Court were of the opinion that a reversal of the judgment was required on appeal.

*son,* 11 S.W.3d 575, 577 (Ky.2000). However, "the distinct aspects of the *Daubert* analysis—the findings of fact, i.e., reliability or non-reliability, and the discretionary decisions, i.e., whether the evidence will assist [the] trier of fact and the ultimate decision as to admissibility—must be reviewed under different standards." *Miller* at 915. Therefore, the preliminary findings of fact are reviewed for clear error before the ultimate admissibility decision is reviewed for an abuse of discretion. *Id.* A finding of fact is not clearly erroneous if it is supported by substantial evidence. Substantial evidence is evidence taken by itself or as a whole that "has sufficient probative value to induce conviction" in the minds of reasonable persons. *Commonwealth of Kentucky, Cabinet for Human Resources v. Bridewell,* 62 S.W.3d 370, 373 (Ky.2001).

■ Boon Edam extensively argues that the trial court abused its discretion by allowing Dr. Warren Davis to testify. In support thereof, they argue that Dr. Davis was unqualified because his knowledge of the revolving door industry was a by-product of his work as a plaintiff's product liability expert; he was not an engineer but a physicist; he had never worked in the industry nor designed a revolving door; he was the only one in the world to opine that the TQA door was defectively designed; his opinion has not been subject to peer review nor published; that he never performed adequate tests on the door in question or a simulation; and that Dr. Davis had never even seen the door in operation.[12]

Saunders counter-argues that Boon Edam failed to cite any clear errors contained in the factual findings made by the trial court in its *Daubert* order or abuses of discretion of the trial court. In support thereof, Saunders cites this Court to the *Daubert* hearing wherein Dr. Davis explained his qualifications and the scientific and engineering principles upon which the sensors and the sensor system of the TQA door operate.

At the *Daubert* hearing, Dr. Davis testified to his qualifications. He holds a B.S. and Ph.D. in physics from the Massachusetts Institute of Technology and has substantially completed the credits required for a degree in electrical engineering. Dr. Davis has worked with the military, NASA, and has operated a consulting firm. He has extensive knowledge of and experience with automatic doors and presence-detecting sensors. He has consulted in cases involving automatic doors since 1993. In addition, he has consulted for both plaintiffs and defendants in over 200 cases and testified in 58. Dr. Davis was asked to consult by Besam, Inc., a manufacturer of automatic revolving doors and a competitor of Boon Edam, and has consulted for the City of San Francisco on automatic doors. Dr. Davis has consulted for BEA, Inc., a company that designs and builds presence-detecting sensors used in automatic doors, including the infrared sensors used in the TQA door. Dr. Davis's work with automatic doors has included revolving doors, the testing and inspection of sensors and automatic doors in both the laboratory and the field, the analysis of patents, and he has reverse engineered infrared sensors.

12. Boon Edam repeatedly asserts that Dr. Davis's testimony was nothing more than a bare assertion. We disagree. Dr. Davis clearly explained that the TQA door had a dead zone, as evidenced by the Baughman tests which he reviewed via the videotape, that the dead zone could be rectified in a number of ways, and that the lack of a sensor caused the injury to Saunders. We believe that Dr. Davis's opinion was based on sound scientific premises and observations based upon his review of the discovery materials.

Moreover, Dr. Davis testified that he had inspected and tested other models of Boon Edam automatic revolving doors and those manufactured by a competitor, which were equipped with presence-detecting sensors that covered the leading edge of the door panels, in contrast to the TQA model which had insufficient sensor coverage. Dr. Davis testified that when these presence-detecting sensors were installed on a revolving door, they would stop the door panels from striking a user.

After hearing Dr. Davis's extensive qualifications, the trial court denied Boon Edam's *Daubert* motion, finding that he had extensive experience with automatic doors and presence sensors. Specifically the trial court found that Dr. Davis had experience testing and designing sensors; had consulted for a leading sensor manufacturer; inspected multiple automatic revolving doors; studied patents for automatic revolving doors; had a thorough understanding of the laws of physics that govern electromagnetic light, including infrared light used in sensors; and served as a consultant/expert witness in more than 200 cases involving automatic doors during the last thirteen years.

Accordingly, the trial court then found that Dr. Davis's knowledge, professional experience, education, and training qualified him as an expert; that his testimony concerning scientific, technical and specialized knowledge would assist the jury in understanding the evidence and determining the facts at issue; and that his opinions are based upon sufficient facts and data, are the product of reliable, accepted, scientifically valid principles and methods, and that he has applied these principles and methods reliably to the facts of the case.

We agree with Saunders that the trial court's findings in the *Daubert* order are not clearly erroneous given the substantial evidence presented at the hearing. Moreover, the admission of Dr. Davis's testimony was not an abuse of discretion. As held in *Murphy, infra,*

> The mere fact that Schroering's area of expertise may not lie in designing or manufacturing escalators does not mean that he is not qualified to testify as an expert witness in this case. . . .
>
> If we were to declare as a rule of law that one must actually have practical experience in a given industry in order to qualify as an expert in litigation involving its products, we might very well place an onerous burden on plaintiffs in some cases. Where the industry is small and tightly knit, it may be very difficult for the plaintiff to obtain the services of an expert currently employed therein, and it might be equally difficult to find someone who was formerly employed in the industry. But the key experts of an industry would normally be available to the defendant.' . . ." *Id.* at 88.

*Murphy by Murphy v. Montgomery Elevator Co.,* 957 S.W.2d 297, 299 (Ky.App.1997)(internal citations omitted).

Thus, Boon Edam's argument that Dr. Davis does not have adequate experience in the revolving door industry is unpersuasive. Similarly, we are unaware of precedent which mandates that an expert may not rely upon or evaluate tests performed by another, as in the case *sub judice* when Dr. Davis evaluated the tests of the TQA door by Baughman.

Dr. Davis's testimony helped the jury understand the limitations of the sensors in place on the TQA door, the apparent need for additional sensors, and the cause of Saunders' injuries. Dr. Davis's extensive knowledge, education, training, and professional experience qualify him as an in expert in this matter. As such, the trial

court committed no error in denying Boon Edam's *Daubert* motion.

█ We now turn to Boon Edam's argument that it was entitled to a directed verdict because Saunders failed to present any competent evidence that the TQA door was in a defective condition unreasonably dangerous, and that the trial court erred in failing to grant the directed verdict motion based upon the statutory presumption of non-defectiveness established by KRS 411.310(2).

At the outset, we note that our role as an appellate court is to determine whether it was error for the trial court to not grant a directed verdict motion. *Lewis v. Bledsoe Surface Min. Co.*, 798 S.W.2d 459 (Ky. 1990). In our determination we must bear in mind that,

> In ruling on either a motion for a directed verdict or a motion for judgment not withstanding the verdict, a trial court is under a duty to consider the evidence in the strongest possible light in favor of the party opposing the motion. Furthermore, it is required to give the opposing party the advantage of every fair and reasonable inference which can be drawn from the evidence. And, it is precluded from entering either a directed verdict or judgment n.o.v. unless there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable men could differ.

*Taylor v. Kennedy*, 700 S.W.2d 415, 416 (Ky.App.1985)

This Court is not at liberty to make credibility determinations or determine the weight which should be given to the evidence because this is a function for the trier of fact. *Lewis* at 461. "Where there is conflicting evidence, it is the responsibility of the jury to determine and resolve such conflicts." *Gibbs v. Wickersham*, 133 S.W.3d 494, 495 (Ky.App.2004). The denial of a directed verdict motion should only be reversed on appeal when it is shown that the jury verdict was palpably or flagrantly against the evidence such that it indicates the jury reached the verdict as a result of passion or prejudice. *Lewis* at 462. Given this stringent standard of review we now turn to the arguments presented by Boon Edam.

First, Boon Edam asserts that it was entitled to a directed verdict because Saunders failed to present any competent evidence that the TQA door was in a defective condition unreasonably dangerous. In support thereof, Boon Edam argues that Saunders failed to present any evidence that the TQA door presented any risk of accidental injury at the time it entered the stream of commerce, or that an ordinarily prudent manufacturer, knowing the condition of the door, would have chosen not to put it on the market. Boon Edam asserts that the legal standard required evidence of knowledge or information known or knowable to the manufacturer when the door was placed into the stream of commerce and before the injury-producing event by which an ordinarily prudent manufacturer, being fully aware of the risk, would not have put it on the market. Boon Edam repeatedly emphasizes that Saunders is the only person in the world to have reported an injury while using the TQA door.[13]

---

13. A curious argument which basically reasons that because no one was previously injured there must not be any danger arising from the operation of the door. If accepted, a corollary would be there could never be an injury caused by the operation of the door in the first instance because there had never been a prior injury. This is simply an untenable argument.

Saunders wholly disagrees and cites this Court to the record where she presented evidence supporting the jury verdict that the TQA door was in a defective condition unreasonably dangerous. Moreover, Saunders counter-argues that the standard elucidated in *Montgomery Elevator Co. v. McCullough by McCullough*, 676 S.W.2d 776 (Ky.1984), clearly sets forth a strict liability standard and not a negligence standard. Saunders argues that *Montgomery Elevator* merely requires the plaintiff to set forth that the manufacturer knew of the danger or should have known of the danger at the time it was placed on the market. We agree with Saunders.

In *Montgomery Elevator*, the Kentucky Supreme Court explained modern products liability law:

The fundamental shift in products liability law from a negligence standard to the new theory expressed in § 402A of the *Restatement (Second) of Torts* occurred in Kentucky in 1966 when § 402A was adopted in *Dealers Transport Co. v. Battery Distributing Co.*, Ky., 402 S.W.2d 441 (1966). The shift is from the conduct of the actor, which is the problem in negligence cases, to the condition of the product. This is the "special liability" in § 402A of persons engaged in the business of manufacturing or selling products and the standard for such liability is if the product is "in a defective condition unreasonably dangerous to the user or consumer...."

In *Nichols*, [*Nichols v. Union Underwear Co. Inc.*, 602 S.W.2d 429 (Ky. 1980)] we arrived at a simple standard for the trier of fact to use to apply the words in § 402A. The manufacturer is *presumed to know* the qualities and characteristics, and the actual condition, of his product at the time he sells it, and

the question is whether the product creates "such a risk" of an accident of the general nature of the one in question "that an ordinarily prudent company engaged in the manufacture" of such a product "would not have put it on the market." ... Considerations such as feasibility of making a safer product, patency of the danger, warnings and instructions, subsequent maintenance and repair, misuse, and the products' inherently unsafe characteristics, while they have a bearing on the question as to whether the product was manufactured "in a defective condition unreasonably dangerous," are all factors bearing on the principal question rather than separate legal questions. In a particular case, as with any question of substantial factor or intervening cause, they may be decisive.

*Montgomery Elevator Co.* at 780–781 (internal citations omitted). Thus, the ultimate question for the jury was whether the TQA door was in a defective condition unreasonably dangerous for use by users when sold by the manufacturer, i.e., whether the product created such a risk of an accident of the general nature of the one in question that an ordinarily prudent manufacturer of such products would not put it on the market. *Montgomery Elevator* at 780–782.

Saunders cites to the record where the jury was presented ample evidence from which they could conclude that the TQA door was in a defective condition unreasonably dangerous for use when it placed into the market. First, Saunders cites to the testimony provided by three eyewitnesses who all corroborated her version of events that the TQA door struck her as she attempted to enter the doorway.[14] Next,

14. We note that, contrary to Boon Edam's assertions, our review of the record shows

that Ann Williamson's testimony did not establish that Saunders was inside the door

Saunders cites to Baughman's testimony that when he tested the TQA panels he found a dead zone located at the leading edge on each panel. Last, the testimony provided by Dr. Davis explained that the TQA door was defectively designed. In support of that determination, Dr. Davis noted that the door failed to detect Saunders' presence at the leading edge of the door due to the dead zone, and that more sensors on the door could have eliminated the dead zone. Dr. Davis also stated that there were multiple alternative designs for the sensor system which would have rectified the dead zone and that were feasible in 2000 when the door was placed into the stream of commerce. Finally, he opined that Boon Edam's other-sized revolving doors utilize infrared sensors to cover the leading edge of the door panels, and that the failure to cover the leading edge of the door with appropriate sensors caused the injury to Saunders.

Based on the aforementioned evidence presented to the jury, the trial court did not commit error in failing to grant the motion for directed verdict, because there was not a complete absence of proof on a material issue in the action, i.e., the question as to whether the door was in a defective condition unreasonably dangerous for use when it was placed on the market was properly before the jury.

■ We now turn to Boon Edam's remaining directed verdict argument, that the trial court erred in failing to grant the

directed verdict motion based upon the statutory presumption of non-defectiveness established by KRS 411.310(2).

KRS 411.310(2) states:

In any product liability action, it shall be presumed, until rebutted by a preponderance of the evidence to the contrary, that the product was not defective if the design, methods of manufacture, and testing conformed to the generally recognized and prevailing standards or the state of the art in existence at the time the design was prepared, and the product was manufactured.

Boon Edam argues that the evidence presented to the jury showed that the TQA door was "state of the art" based on the standard provided by ANSI in 2003,[15] three years after the door was installed.[16] Saunders argues that Dr. Davis's testimony established that the TQA door did not meet the definition of "state of the art" because it failed to use readily available sensor technology to alleviate the problem; that the ANSI standards were only a minimum performance guideline issued by the automatic door industry and, thus, should not provide a shield behind which Boon Edam could hide their defective door.

This Court in *Murphy by Murphy v. Montgomery Elevator Co.*, 957 S.W.2d 297 (Ky.App.1997), interpreted KRS 411.310(2) to mean:

when she was struck. As Saunders expounds, the eyewitness accounts of the accident were unsuccessfully refuted by Boon Edam.

**15.** There were no applicable ANSI guidelines for revolving automatic doors until 2003 based on the evidence presented.

**16.** Boon Edam also asserts that Dr. Davis's definition of "state of the art" as "the edge of what is possible," bordered on the irrational by likening it to the "Twilight Zone." After

our review of the record, Boon Edam's argument is disingenuous at best. Dr. Davis opined that the term "state of the art" had two possible interpretations: one was what the industry was willing to put out there and the second, which was his definition and he thought was that of most people, that the "edge of the envelope" is about what is capable. Boon Edam asked if this was similar to the "Twilight Zone," to which Dr. Davis disagreed.

[W]e read the plain language of the statute to mean that the presumption may be rebutted by evidence that the product was defective and not that there must be evidence that the design did not conform to prevailing standards or was not state of the art at that time.

*Murphy* at 300. This interpretation was reiterated in *Leslie v. Cincinnati Sub-Zero Products, Inc.*, 961 S.W.2d 799 (Ky. App.1998):

The statutory presumptions of KRS 411.310 do no more than leave the burden of proof with Leslie [as plaintiff] to prove that the thermal unit was defective. Contrary to what CSZ has suggested, Leslie does not have to prove that the unit was not designed in accordance with the 1980 "state of the art." The "sole question in a products liability case," regardless of whether the case involves failure to adequately warn, defective design, or other products liability theories, is whether the product is defective.

*Leslie* at 803 (internal citations omitted).

Thus, in order to overcome the statutory presumption found in KRS 411.310, Saunders had to present evidence that the TQA door was defective. As previously discussed, Saunders presented ample evidence to survive Boon Edam's directed verdict motion and present the question of whether the TQA door was defective to the jury. Accordingly, the trial court did not err in denying Boon Edam's directed verdict motion in light of KRS 411.310.

■ Given that Boon Edam was not entitled to a directed verdict, we now turn to their last argument that Saunders failed to present any evidence to support an award of future pain and suffering. Saunders counter-argues that this issue was not properly preserved for appeal, because Boon Edam did not object to the jury instructions which allowed the jury to award damages for future pain and suffering not to exceed $300,000. Boon Edam does not contest that this issue is not preserved for review, but instead requests this Court to make an exception to the rule that a party must timely object to jury instructions. This we decline to do.

Under Kentucky Rules of Civil Procedure (CR) 51, the time to object to jury instructions is prior to the court's instructing the jury.[17] As stated in *Harris v. Thompson*, 497 S.W.2d 422, 431 (Ky.1973), "if the appellants were not satisfied with any phase or portion of the instructions the time to speak was before they were given to the jury." A review of the record shows that Boon Edam neither objected nor tendered jury instructions. Therefore, the error was not preserved for our review under CR 51(3). In light of the foregoing, we affirm the judgment of the Boyd Circuit Court entered February 21, 2008.

ALL CONCUR.

---

**17.** CR 51(3) states:

No party may assign as error the giving or the failure to give an instruction unless he has fairly and adequately presented his position by an offered instruction or by motion, or unless he makes objection before the court instructs the jury, stating specifically the matter to which he objects and the ground or grounds of his objection.
*Id. See also Harris v. Thompson*, 497 S.W.2d 422 (Ky.1973).