RENDERED: AUGUST 19, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1551-MR

KATHRYN TOWERY; KAILEEN
TOWERY; AND DWAYNE A.
TOWERY, FATHER AND NEXT-OF-
FRIEND OF KOLBY TOWERY                                          APPELLANTS


|  | APPEAL FROM WEBSTER CIRCUIT COURT |
|---|---|
| v. | HONORABLE C. RENE' WILLIAMS, JUDGE |
|  | ACTION NO. 18-CI-00037 |


CRAIG T. McCORMICK, IN HIS
CAPACITY AS EXECUTOR OF THE
ESTATE OF JAMES T. McCORMICK,
DECEASED; CRAIG T. McCORMICK,
AS TRUSTEE OF THE JAMES T.
McCORMICK REVOCABLE LIVING
TRUST; CRAIG T. McCORMICK,
INDIVIDUALLY; FREDA S.
McCORMICK, INDIVIDUALLY; AND
ALLISON McCORMICK,
INDIVIDUALLY                                                          APPELLEES

AND


NO. 2019-CA-1552-MR

AUNDREA L. TOWERY                                                    APPELLANT

APPEAL FROM WEBSTER CIRCUIT COURT
v.       HONORABLE C. RENE' WILLIAMS, JUDGE
ACTION NO. 18-CI-00037

CRAIG T. McCORMICK, IN HIS                 APPELLEES
CAPACITY AS EXECUTOR OF THE
ESTATE OF JAMES T. McCORMICK,
DECEASED; CRAIG T. McCORMICK,
AS TRUSTEE OF THE JAMES T.
McCORMICK REVOCABLE LIVING
TRUST; CRAIG T. McCORMICK,
INDIVIDUALLY; FREDA S.
McCORMICK, INDIVIDUALLY;
AND ALLISON McCORMICK,
INDIVIDUALLY

AND

NO. 2019-CA-1576-MR

ESTATE OF JAMES T. McCORMICK,
CRAIG T. McCORMICK,
EXECUTOR; CRAIG T.
McCORMICK; FREDA S.
McCORMICK; JAMES T.
McCORMICK REVOCABLE LIVING
TRUST, CRAIG T. McCORMICK,
TRUSTEE; AND ALLISON
McCORMICK       APPELLEES/CROSS-APPELLANTS

CROSS-APPEAL FROM WEBSTER CIRCUIT COURT
v.       HONORABLE C. RENE' WILLIAMS, JUDGE
ACTION NO. 18-CI-00037

AUNDREA L. TOWERY; KAILEEN
TOWERY; KATHRYN TOWERY;
AND DWAYNE TOWERY AS NEXT-
OF-FRIEND AND FATHER OF
KOLBY TOWERY                                    APPELLANTS/CROSS-APPELLEES


OPINION
AFFIRMING APPEAL NO. 2019-CA-1551-MR,
AFFIRMING IN PART, REVERSING IN PART,
AND REMANDING APPEAL NO. 2019-CA-1552-MR,
AND AFFIRMING CROSS-APPEAL NO. 2019-CA-1576-MR

** ** ** ** **

BEFORE:  DIXON, GOODWINE, AND TAYLOR, JUDGES.

TAYLOR, JUDGE:  Kathryn Towery, Kaileen Towery, and Dwayne A. Towery,

father and next-of-friend of Kolby Towery, bring Appeal No. 2019-CA-1551-MR

from May 23, 2019, orders, a May 31, 2019, order, a June 6, 2019, order, and a

September 12, 2019, order of the Webster Circuit Court.  Aundrea L. Towery

brings Appeal No. 2019-CA-1552-MR from May 23, 2019, orders, a June 6, 2019,

order, and a September 12, 2019, order of the Webster Circuit Court.  Estate of

James T. McCormick, Craig T. McCormick, Executor; Craig T. McCormick; Freda

S. McCormick; James T. McCormick Revocable Living Trust, Craig T.

McCormick, Trustee; and Allison McCormick bring Cross-Appeal No. 2019-CA-

1576-MR from May 23, 2019, orders, a May 31, 2019, order, and a September 12,

2019, order.  We affirm Appeal No. 2019-CA-1551-MR and affirm in part, reverse

-3-

in part, and remand Appeal No. 2019-CA-1552-MR.  We also affirm Cross-Appeal 2019-CA-1576-MR.

James T. McCormick (Tommy) was a business man residing in Webster County, Kentucky.  Tommy had founded Custom Engineering, Inc., and had amassed considerable wealth at the time of his death on January 5, 2017.  He was survived by his wife of 47 years, Freda McCormick, and by two children, Craig T. McCormick and Aundrea L. Towery.  Craig has two children, and Aundrea has three – Kathryn Towery, Kaileen Towery, and Kolby Towery.

On September 8, 2017, Craig filed the Last Will and Testament of Tommy in the Webster District Court (Action No. 17-P-00088).  The will was executed on December 18, 2016 (2016 Will).  Under the 2016 Will, Craig was appointed as executor and most of Tommy's property passed to Craig T. McCormick Revocable Living Trust (Trust).  The Trust was initially created on April 18, 2011, but was restated by execution of a Restatement of Trust Agreement (Trust Agreement) also on December 18, 2016.  Neither Aundrea nor her three children were devised any property under the 2016 Will or were provided for by the 2016 Trust.

On March 16, 2018, Aundrea filed a complaint and, on June 25, 2018, an amended complaint against Craig, in his capacity as Executor of the Estate of James; Craig, in his capacity as Trustee for the Trust; Craig, individually; Freda;

-4-

and Allison McCormick, Craig's wife (collectively referred to as defendants).[1]  In

the complaint, Aundrea alleged, in relevant part:

### COUNT I – FORGERY AND PROMOTION OF FRAUDULENT DOCUMENTS

20.     The purported Last Will and Testament of James T. McCormick is invalid as it was not properly executed in compliance with the provisions of [Kentucky Revised Statutes] KRS 394.040.

21.     The purported signature of James T. McCormick on the Last Will and Testament dated December 18, 2016, admitted to probate by the Webster District Court on September 19, 2017, is not that of James T. McCormick.  The handwriting of the decedent on the Last Will and Testament has been examined by an expert.  The expert has affirmed that the signature on said Last Will and Testament of James T. McCormick, dated December 18, 2016, is not the genuine signature of James T. McCormick.  The Will is a forged and fraudulent document.

22.     The decedent, James T. McCormick, did not sign the alleged Last Will and Testament on December 18, 2016.  The Plaintiff, Aundrea Towery, and others were continuously in the home of the decedent all day on December 18, 2016, for her daughter's birthday party.  James T. McCormick did not leave the house on December 18, 2016.  None of the witnesses named in the alleged Will came to the home of James T. McCormick on December 18, 2016.  The notary named on the Last Will and Testament did not come to the home of James T. McCormick on December 18, 2016.  None of the witnesses and/or the notary who each purportedly

---

[1] Allison McCormick was added as a defendant by a February 8, 2019, order of the Webster Circuit Court.  The claims of tortious interference with inheritance and civil conspiracy were alleged against Allison.

-5-

signed the purported Will in the presence of each other and in the presence of James T. McCormick, signed the will on December 18, 2016. The signature of the Testator, James T. McCormick, was forged.

23. Kentucky law requires that the testator sign a will in the presence of two witnesses and that the witnesses sign in the presence of each other.

24. As the signature on the Will is not that of James T. McCormick and the witnesses did not sign the will in the presence of either James T. McCormick or each other on December 18, 2016, the Will is invalid.

. . . .

26. Further, as the purported signature of James T. McCormick on the December 18, 2016, amendment to the 2011 James T. McCormick Revocable Living Trust is not the signature of James T. McCormick. The handwriting of the decedent on the December 18, 2016, Trust document has been examined by an expert. The expert has also affirmed that the signature of James T. McCormick is not the genuine signature of James T. McCormick. The December 18, 2016, Trust document is a forged and fraudulent document. The Plaintiff, Aundrea Towery, and others were continually in the home of James T. McCormick all day on December 18, 2016. James T. McCormick did not sign the purported Trust Amendment on December 18, 2016. James T. McCormick did not leave the house all day on December 18, 2016. The purported notary did not properly notarize the alleged signature of James T. McCormick on December 18, 2016, in the presence of James T. McCormick.

27. The signature of James T. McCormick on the December 18, 2016, Trust document was forged. As a result, the December 18, 2016, amendment to the

James T. McCormick Living Trust is void and of no effect.

. . . .

## COUNT II – LACK OF CAPACITY

. . . .

31.     Prior to the purported execution of the Will on December 18, 2016, and at the time thereof, the decedent, James T. McCormick, was under the influence of various medications and had taken chemotherapy on December 16, 2016.

32.     The medications and intensive cancer treatment worked on the mind and body of James T. McCormick to such an extent that he did not know the natural objects of his bounty, his obligations to them, and the character and value of his estate on December 18, 2016.  Further, as a result of the various medications and chemotherapy, James T. McCormick failed to dispose of his estate in accordance with his own fixed estate planning.  The Will, Trust and two (2) Deeds and other documents purportedly signed on December 18, 2016, are not consistent with an estate plan for the decedent, which included provisions that would not otherwise have been present to exclude the Plaintiff, Aundrea Towery, absent the effects of the medications and chemotherapy and undue influence.

33.     James T. McCormick was in extreme pain and, combined with the levels of medication he was taking and chemotherapy two (2) days earlier, James T. McCormick suffered from mental and physical impairment and incapacity on December 18, 2016.

34.     As James T. McCormick lacked the requisite mental capacity to execute the Last Will and Testament, the Amendment to the 2011 James T. McCormick

Revocable Living Trust, and the two deeds conveying approximately thirty-five (35) parcels of property and any other documents of conveyance when he executed those instruments on December 18, 2016. All of the aforementioned instruments are invalid and should be stricken from the records of the Webster and Crittenden County Clerk's Offices.

## COUNT III – UNDUE INFLUENCE

. . . .

36.     James T. McCormick's purported signing of the disputed documents and any additional actions purportedly taken by James T. McCormick on December 18, 2016, were the product of undue influence by the Defendants, Freda and Craig, and others acting in concert with them, upon the Decedent, James T. McCormick. The Defendants interfered with and excluded the express intent of James T. McCormick, prior to the effects of his chemotherapy and medications taken by him, that his real and personal property be distributed pursuant to his express intent as set forth in the terms of James T. McCormick's prior estate planning by essentially disposing all of his property and that of the Plaintiff to his spouse and two (2) children, and increasing his estate tax liability.

37.     The Defendants initiated and conducted a scheme on their behalf, wherein they individually engaged professionals to expressly prepare documents, including the Will, trust, deeds and assignment of personal property. To the best of the Plaintiffs' information and belief, the documents were concealed and not disclosed to James T. McCormick.

38.     To the best of the Plaintiff's information and belief, the Defendants engaged and directed the preparation and execution of all of the documents that were not signed by James T. McCormick on December

-8-

18, 2016, eliminating the Plaintiff, the daughter of James T. McCormick.

39. At the time the documents were executed, James T. McCormick was terminally ill and both physically and mentally weak, undergoing cancer treatment and under the influence of many medications.

40. The documents were unnatural in their provisions, as they were in direct conflict with the prior intent of James T. McCormick that all his assets be divided equally between his heirs at law and that his federal estate taxes being reduced to the maximum extent allowed.

41. To the best of the Plaintiff's information and belief, the principal beneficiaries of the documents, being Defendants Craig and Freda, and those acting in concert with them, were directly involved in and coordinated the preparation of the documents.

42. Defendants Craig and Freda exerted control over the business affairs of James T. McCormick.

. . . .

44. As a consequence of the undue influence exerted upon James T. McCormick by the aforementioned Defendants, the documents executed on December 18, 2016, were not the will of James T. McCormick but instead constituted the sole will of the Defendants and those acting in concert with them.

45. Plaintiff requests this Court, after a trial by jury, to enter judgment declaring the Last Will and Testament of James T. McCormick, the Amendment to the James T. McCormick Revocable Living Trust, two deeds and an "Assignment of Personal Property," all purportedly signed on December 18, 2016, to each be invalid and null and void *ab initio*, and the real property and personal

property, passing to the Estate of James T. McCormick and then to the Plaintiff and Defendants pursuant to the terms of the prior Last Will and Testament of James T. McCormick and/or intestate.

. . . .

## COUNT XI – TORTIOUS INTERFERENCE WITH EXPECTANCY

95.     The Plaintiff was a vested beneficiary and entitled to the percentage of the corpus of the Estate of James T. McCormick pursuant to the prior estate planning documents executed by the decedent, James T. McCormick prior to 2016.

96.     The Defendant and others acting in concert with them, have intentionally and willfully interfered with the Plaintiff's expectancy of inheritance by conduct amounting to one or more acts of fraud, forgery, duress or undue influence.

97.     But for the Defendants' actions, and other acting in concert with them, a reasonable expectancy of inheritance would have been realized by the Plaintiff.

. . . .

## COUNT XII – CIVIL CONSPIRACY

. . . .

100.   As a result of the acts described herein and other acts yet still undiscovered and unknown at this time, the Defendants and others acting in concert with them, acted under an agreement, in concert and pursuant to a common scheme to divert the assets of James T. McCormick from being devised, bequeathed and conveyed to the Plaintiff in conformity with the intentions and prior estate planning of the decedent, and

in lieu thereof retained in his estate, and administered and distributed pursuant to the terms of the Plaintiff's father's Last Will and Testament and Revocable Trust, as Amended in 2012, executed prior to December 18, 2016.

June 25, 2018, Amended Complaint at 6-11 and 21-22.

Defendants filed an answer to the complaint, and after the amended complaint was filed, defendants filed a motion to dismiss. In the motion to dismiss, defendants argued that Aundrea lacked standing as she was not an aggrieved party per KRS 394.200. Defendants maintained that Aundrea was not a beneficiary under the 2016 Will and Trust and, likewise, was not a beneficiary under Tommy's prior Will and Trust executed in 2011. Therefore, defendants asserted that Aundrea failed to state a claim upon which relief could be granted due to her lack of standing.

Subsequently, on August 10, 2018, Kathryn, Kaileen, and Dwayne A. Towery, as next friend and father of Kolby, (collectively referred to as the Towery grandchildren) filed a motion to intervene. In the motion, the Towery grandchildren stated that under prior wills and trusts of their grandfather, Tommy, they were beneficiaries and would be affected by the outcome of the proceedings.

Simultaneously, on August 10, 2018, Aundrea filed a response to defendants' motion to dismiss. Aundrea argued that the defendants waived the issue of standing because said defense was not specifically raised in defendants' answer to the original complaint. Instead, Aundrea pointed out that defendants

-11-

only raised the defense in a motion to dismiss filed after the amended complaint. Alternatively, Aundrea maintained that she possessed standing to challenge the validity of the 2016 Will and Trust because she was an heir at law.

By order entered October 22, 2018, the circuit court granted the Towery grandchildren's motion to intervene. In the Towery grandchildren's crossclaim and counterclaim, they requested:

> 1.     That there be adjudication and determination as to documents which constitute the Last Will and Testament, Trusts and Estate plans of the decedent and grandfather James T. McCormick.
>
> 2.     That the rights of the Intervenors in and to the Estate of James T. McCormick be adjudicated by this Court.

October 22, 2018, Intervenors' Crossclaim and Counterclaim at 2.

The circuit court ultimately granted defendants' motion to dismiss based upon Aundrea's lack of standing to challenge the validity of the 2016 Will and Trust in a November 7, 2018, order. The circuit court concluded that Aundrea was not an aggrieved party pursuant to KRS 394.240. Aundrea's claims unrelated to the validity of the 2016 Will and Trust were not affected by the court's order of dismissal.

Defendants then filed a motion for summary judgment on March 22, 2019. In the motion, defendants asserted that no material issues of fact existed as to Tommy's mental capacity to execute the 2016 Will and Trust Agreement:

-12-

Tommy's estate plan – his will and trust – and the steps taken in furtherance thereof are clear evidence of a rational act, rationally done. Tommy hired an attorney to prepare his estate planning documents. *See generally* Blanford Aff. He scheduled that attorney to come to him at his Custom Engineering Offices in Clay, Kentucky. He arranged to have witnesses at Custom Engineering for the execution of the estate planning documents.

During the month of December, 2018, Tommy spoke with his attorney and his investment and wealth advisors. He clearly expressed his desires to his attorney; his primary concern being provision and protection of his wife. With Mr. Legate, Tommy was working to move non-qualified assets from his investment account into his trust, completing the funds transfer on December 22, 2016, mere days after executing the Trust document. Tommy also worked to move his Hilliard Lyons account to the Trust, said transfer being completed on December 20, 2016, again, mere days after executing the Trust document. Tommy was fully competent and knew exactly what he was doing. Tommy's is a rational act, rationally done and shows he was of a sound and disposing mind during its execution.

A number of witnesses testified Tommy never lost his mental abilities. He was still working and running the operations of Custom Engineering.

When he executed his will, Tommy had the requisite knowledge of the four items set forth above. First, Tommy knew the objects of his bounty. Aunde [sic], Dwayne, Kaileen, and Kolby were visiting the same day Tommy executed his will. In their depositions, they admit he always knew them throughout their visit. Kaileen Dep. at 168:14-17; Aundrea Dep. at 63:9-18; Dwayne Dep. at 90:18-19. Tommy expressed his concerns regarding the ultimate disposition of his property if his wife should remarry. Freda was the object of his bounty, but, should she remarry, that person was

not. Tommy took steps to ensure any future spouse would not receive any portion of his estate.

Second, Tommy knew his obligations to the objects of his bounty. Freda was aware, participated, and authorized the transfers to the Trust. Tommy was adamant that Freda be well provided for during her lifetime, and protected from predators. Both Freda and Craig attended the meeting with his attorney at Tommy's request.

Tommy took steps to ensure his investment accounts were properly conveyed to the trust. *See generally* Adam Legate Aff., Burl Milligan Aff. During the meeting with his attorney immediately before executing his will, he had questions about property he owned in Florida. Tommy specifically listed the Custom Engineering stock and directed Craig receive it immediately upon his death.

Finally, Tommy's estate was disposed according to his purpose. Tommy wanted Freda well provided for in her lifetime and protected from predators. He also expressed concerns regarding his wife's possible remarriage after his death. A such, he appointed his son, Craig, as Trustee. To ensure Aunde [sic] did not receive anything from an earlier insurance trust, Tommy stopped making payment on the policy so it lapsed and the Trust terminated. Aunde [sic] had not been named as a beneficiary in neither the 2009 or 2011 Will or Trust documents. Tommy was adamant that she not benefit from his estate. The will he executed on December 18, 2016[,] ensured his estate was disposed according to his purpose.

Plaintiff and Intervenors have provided no evidence showing Tommy lacked the requisite mental capacity to execute his will. In fact, the deposition testimony shows quite the opposite. The evidence shows Tommy was mentally competent and still running

Custom Engineering. The testimony establishes that Tommy knew the objects of his bounty and the character and value of his estate. It also confirms Tommy had an estate plan and his will distributed his estate in accordance with that plan. There is no genuine issue of material fact concerning Tommy's mental capacity to execute a will and Defendants are entitled to judgment as a matter of law on this issue.

March 22, 2019, Motion for Partial Summary Judgment at 16-19 (citations omitted). Additionally, defendants argued that no material issue of fact existed as to whether Tommy's execution of the 2016 Will and Trust Agreement was the product of undue influence. In fact, defendants claimed that none of the badges of undue influence were present:

At the time he executed on his will on December 18, 2016, Tommy was fighting cancer. He had a chemo appointment the Friday before the will execution. Kaileen Dep. 114:2-25. But Tommy drove to Evansville for the appointment. He went in by himself, despite requests from his granddaughter to go with him. He walked to the appointment and did not require the assistance of a wheelchair. He did some Christmas shopping after the appointment. He went Christmas shopping again the next day. He may have been taking treatment for cancer, but he was still running Custom Engineering. While he was a cancer patient, he did not have the physical look of one.

Second, Tommy was not mentally impaired. He was called a genius, McCulloch Aff. ¶ 7; [Dwayne] Dep. 104:19-20; Kaileen Dep. 71:22-72:11; Craig Aff. ¶ 5, and otherwise recognized for his intelligence. Throughout her December 15-21[,] 2016[,] visit with her grandparents, Kaileen unequivocally stated her grandfather knew the people around him, Kaileen Dep. at

168:14-17, was having normal conversations with everyone, *id.* 168:22-169:3, and continued to do his daily Sudoku puzzles, *id.* at 168:18-21. Again, he may have been taking treatment for cancer, but it never affected his mind.

Third, the will was not unnatural. There is no "per se unnatural will." *Fischer v. Heckerman*, 772 S.W.2d 642, 646 (Ky. App. 1989). "[N]o will is unnatural in a legal sense if it is not contrary to the known views or conceptions of the testator or if it be such as he might have been expected to make," *Clark v. Johnson*, 105 S.W.2d 576, 580 (Ky. 1937). Tommy's will is not unnatural.

Tommy's will made provision for his wife, Freda, the most natural and primary object of his bounty. He wanted to protect her from predators and to protect his estate from any future spouse she may have, so he used a Trust, with Craig, their son, as Trustee. Freda was aware and participated in moving assets to the Trust. At Tommy's request, Freda and Craig were both present during the meeting with the attorney. There was estrangement between Tommy and Aunde [sic] and her family. Aunde [sic] was not a beneficiary in prior wills and Tommy's opinion on that had not changed.

Fourth, the relationship between Tommy and Freda and Tommy and Craig is neither recent nor short. Tommy and Freda were married for 47 years. Craig is Tommy's son. Contrast this with the brief relationship at issue in *Burke v. Burke*, 801 S.W.2d 691 (Ky. App. 1990) and *Belcher v. Somerville*, 413 S.W.2d 620 (Ky. 1967). In *Burke*, the decedent, Heber, had only known the beneficiary, Lexie, for approximately two months prior to executing his will. *Burke*, 801 S.W.2d at 693-694. In *Belcher*, Mrs. Belcher had only been serving as a nurse for the decedent, Ms. Heller, for a little more than two months before Ms. Heller executed her will. *Belcher*, 413 S.W.2d at 622. Here the relationships were

-16-

well over forty years long. Tommy and Freda were husband and wife. Their lives, their home, their business – they built it all together. Tommy and Craig were father and son. Craig worked alongside his father at Custom Engineering and Tommy was preparing him to take over the business.

Fifth, there was no participation by any beneficiary in the preparation of the will. Dianne Blanford clearly stated she had no discussions with Freda or Craig prior to the date of executing the documents. Freda and Craig confirmed this. Freda even reported the meeting with Dianne was at an inconvenient time for her. Freda and Craig were present at the meeting prior to executing the will at Tommy's request. Freda may have been aware, participated, and authorized the transfers to the Trust, Adam Legate Aff. ¶ 13; Milligan Aff. ¶ 5, but she was not involved in the preparation of the will.

Sixth, the beneficiary did not possess the will. In fact, Dianne Blanford was in possession of the original will. The intention was to copy and return, but with the holidays and Tommy's sudden death a few days later, the attorney kept the original will at her Lexington office until it was probated with the Webster District Court.

Seventh, the beneficiaries, Freda and Craig, did not restrict contact between Tommy and Aunde [sic] and her family. Plaintiff and Intervenors own testimony show Freda and Craig did not restrict contact between them and Tommy. No one ever prevented Aunde [sic] from seeing or talking with her father. Kaileen testified no one ever prevented her or her family from returning to Clay and retrieving items they left in the house in Clay. In fact, Tommy even purchased a covered trailer to assist in moving large items from the home to Alabama. No one prevented them from visiting Tommy and Freda. Aundrea, Dwayne, and their children were actually at Freda and Tommy McCormick's home for several days

before and after Tommy McCormick signed his Will on December 18, 2016.

> Eighth, and finally, the beneficiaries, Freda and Craig, did not have absolute control of Tommy's business affairs. Tommy had absolute control of all of Tommy's affairs. He was in control of his business at Custom Engineering, Kaileen Dep. 170:1-6, and in control of his medical care – controlling even the family members allowed to accompany him into chemo, *id.* at 115:1-116:1. He bought his own Christmas presents, *id.* at 120:19-20, and was determined to get exactly what he wanted, *id.* at 132:9-133:21. Aunde [sic] stated her father "liked to have control," Aundrea Dep. 47:15-16, and continued to be in control, "Because that's just my dad. If he didn't want to go, he wouldn't have went," *id.* at 48:23-24. Kathryn describes her grandfather as a strong-willed guy that would speak his mind. She stated, "He was a man that changed his mind frequently, but knew what he wanted." *Id.* at 17:10-12. Freda says he "was giving everyone directions," and "talked to financial advisors, vendors, employees, and family on a daily basis up until he died." Freda Aff. ¶ 33.

March 22, 2019, Motion for Partial Summary Judgment at 21-24 (citations omitted).

The Towery grandchildren filed a response to the motion for summary judgment. They argued that summary judgment was improper as to both claims of undue influence and mental capacity as genuine issues of material fact existed:

> [T]he fact that two of Tommy McCormick's grandchildren stand to inherit a significant portion of his estate via their father Craig McCormick. This is much like the *Williams* [*v. Vollman*, 738 S.W.2d 849 (Ky. App. 1987)] case on its face as it is an unnatural and unequivocal disposition and is evidence in and of itself of

-18-

undue influence. The *Williams* court went on to hold that an unequivocal and unnatural disposition by itself is not enough to show undue influence but when coupled with slight evidence of exercise of undue influence, it is sufficient to take the case to the jury. *Williams* supra, page 851. The *Williams* court went on to state: "The participation by an interested party in the preparation of the Will is circumstantial evidence tending to prove the exercise of undue influence. . . . Hence the issue of undue influence should have been submitted to the jury." *Williams*, page 851.

In this instance Craig McCormick by his own Affidavit in support of his Motion for Summary Judgment acknowledges he was in the room with his father when the documents were executed which have effectively disinherited the Intervenors. As the *Williams* court noted, active participation by an interested party in preparation of a Will is circumstantial evidence tending to prove exercise of undue influence.

. . . .

There are many elements of undue influence, one of which is susceptibility of influence. In this instance, it is undisputed from the Defendants' own Affidavits that Tommy McCormick was fearful as he was fighting cancer. The second element is the relationships and existence of a confidential relationship between the victim and the influencer. In this case, once again Craig McCormick by his own Affidavit has referenced the fact that he worked very closely with his father and had the opportunity to influence him on the decisions of estate planning that would disinherit his sister's grandchildren and his sister. A third crucial element that is often looked at is the change of the victim's past plans. In this instance, it is the Intervenors while contingent beneficiaries in the 2016 plans where an absolute beneficiary of the 2011 estate beneficiary plans.

-19-

. . . .

It is undisputed that the Intervenors and [Aundrea Towery] had an estranged relationship from Tommy McCormick for a period of time. From Kaileen Towery's deposition she indicated the parties were estranged and did not see [each] other from March 2009 until May 19, 2012. A lot of this arises out of an incident in which Tommy McCormick assaulted Kaileen Towery, was arrested and lodged in the Webster County Detention Center. Thereafter the Towery Family moved to Alabama and South Africa.

Notwithstanding this period of estrangement (2009-2012), Tommy McCormick in his 2011 estate planning documents left the Intervenors a minimum of $1.5 million total.

Notwithstanding the incident of Tommy McCormick assaulting Kaileen Towery, the testimony which is undisputed in this matter is that on December 18, 2016[,] Tommy was in a loving relationship with the Intervenors, his grandchildren. The Affidavit of Pauline McCormick in support of the Defendant's Affidavit dated March 22, 2019[,] clearly shows that on December 18, 2016[,] Tommy McCormick was in a loving relationship as Pauline states, "We celebrated Kaileen's birthday with a big supper on the evening of Sunday, December 18, 2016." Pauline confirms that Aundrea was invited to come to the house and stay during the weekend of December 16, 2016[,] and everyone came except Kathryn, who stayed in Alabama to take care of the family pets.

It is also undisputed that in December, 2016 Tommy McCormick was not at his self [sic] mentally. Kaileen Towery's testimony is on Saturday December 17, 2016, the day before the alleged documents were executed, all he could eat was mashed potatoes. However, Kaileen Towery does acknowledge that he

-20-

could carry on a sensible conversations [sic] and still knew who everybody was. There has been no real dispute that Tommy McCormick knew who everybody was notwithstanding the allegations of the Defendants in their Motion.

Even by the Defendants' own Affidavits in this matter, it is clear that a Summary Judgment is not permissible on the issue of mental capacity. The Court should review the following factors relative to Tommy McCormick:

- The Freda McCormick Affidavit of March 22, 2019[,] specifically states that on December 16, 2016, prior to the execution of the alleged documents that Tommy McCormick had a treatment in Evansville and specifically in paragraph 33 she acknowledges his treatments were getting rough.

- The Affidavit of Pauline McCormick dated March 22, 2019[,] likewise states as follows: "My son, Tommy McCormick, did have some physical effects of the chemo therapy." Pauline McCormick also is very emphatic that everyone was emotional during this time of his illness and they knew the cancer was progressing. (Pauline McCormick Affidavit of March 22, 2019.)

- The deposition of Dr. Anthony W. Stephens which is in the record and incorporated herein by reference shows that Tommy McCormick was taking numerous medications in the time frame of December, 2016 (Stephens' deposition, page 64-116.)

- The deposition of Dr. Anthony W. Stephens which is filed in the record and incorporated herein by reference confirms that Tommy McCormick was seen by Dr. Stephens on Wednesday, December

-21-

14, 2016[,] and took his first chemo treatment using a port.  Dr. Stephens further had Tommy McCormick receive treatment on Friday, December 16, 2016[,] and although Dr. Stephens did not personally see Mr. McCormick on that date, he did admit that on December 14, 2016[,] Tommy McCormick was already getting weak and fatigued, had diarrhea, dehydration and needed intravenous fluids and was also having nausea, fatigue and diarrhea on December 28, 2016, shortly after the documents were allegedly executed.

- Dr. Stephens is emphatic that Tommy McCormick knew he had a poor prognosis and the cancer that re-emerged is not only aggressive but is resistant and an aggressive cancer will take a harder toll on a person that a mild form of cancer.

- When Dr. Stephens was asked to confirm Kaileen Towery's statement that her grandfather on December 16, 2016[,] was dehydrated, fatigued, and had diarrhea, Dr. Stephens stated it is certainly possible.

- The Affidavit of Kaileen Towery attached as Exhibit 3 sets forth the numerous problems her grandfather was having on December 16, 2016[,] including severe diarrhea, thinking irrationally, thinking slower, pain, stress and fatigue.

April 23, 2019, Intervenors Response to Defendants' Motion for Partial Summary Judgment at 7-11 (citations omitted).

Defendants also filed a motion for summary judgment seeking dismissal of Aundrea's and the Towery grandchildren's claims of tortious interference with inheritance and civil conspiracy.  Defendants pointed out that

Kentucky has not recognized the tort of interference with inheritance; moreover, there existed a lack of proof establishing that defendants individually or in concert engaged in conduct that would constitute tortious interference with inheritance.

And, the defendants filed a separate motion for summary judgment arguing that no material issue of fact existed that Tommy did, in fact, execute the 2016 Will and Trust Agreement on December 18, 2016.  In particular, defendants point to the following:

(1) S. Dianne Blanford, long-time attorney of Tommy McCormick, her husband and an attorney, Andrew B. Cox, Amanda Towery, Craig McCormick and Freda McCormick were all present and in the presence of each other when Tommy McCormick executed his will on December 18, 2016.

(2) Attorney Blanford and her husband traveled to Western Kentucky to attend a long-standing family Christmas function and coordinated that trip with the execution of Tommy McCormick's Will.  Certainly the coordination of the execution of the documents with a previously planned trip is not suspicious.

(3) Attorney Blanford's December 21, 2016[,] letter to Freda and Tommy McCormick memorializes the Sunday, December 18, 2016[,] meeting with further instructions about the execution and funding of the James T. McCormick & Freda S. McCormick Irrevocable Family Trust, Craig T. McCormick Trustee.

(4) Tommy McCormick followed up on the instructions in Mrs. Blanford's December 21st letter and executed the James T. McCormick & Freda S. McCormick Irrevocable Family Trust on December 29, 2016[,] in

the presence of Tracy Henry, a United Community Bank of West Kentucky, Inc. employee.

(5) Upon execution of the December 18, 2016[,] Last Will and Testament and Trust, Tommy McCormick immediately communicated with his long-time financial advisors, Adam Legate and Burl Milligan, and instructed them to transfer his and Freda McCormick's non-qualified assets in their investment account to the Craig T. McCormick, Trustee of the James T. McCormick & Freda S. McCormick Irrevocable Family Trust dated December 18, 2016. The transfers were completed in late December 2016.

(6) Steve McCulloch's affidavit that he along with his wife were at Custom Engineering on December 18, 2016[,] around the time the documents were executed and saw Tommy McCormick in his office.

(7) Greg Legate's affidavit that Tommy asked him to come to Custom Engineering to witness some documents. Tommy McCormick called him on December 18, 2016[,] and told him not to come because "someone's husband was there" and he did not need him.

April 18, 2019, Motion for Summary Judgment at 2-4 (citations omitted).

The Towery grandchildren filed a response and argued that material issues of fact existed that precluded summary judgment as to whether the 2016 Will and Trust Agreement were executed by Tommy. The Towery grandchildren point to the depositional testimony of Kaileen, Aundrea, and expert witness, Sharon Hampton. According to the Towery grandchildren, Kaileen averred that she was with Tommy on December 18, 2016, at the time (11:00 a.m.-12:30 p.m.)

the 2016 Will and Trust Agreement were purportedly executed; however, Kaileen stated that Tommy was home during such time period and could not have signed the 2016 Will and Trust Agreement. The Towery grandchildren also cite to Aundrea's depositional testimony. Aundrea stated that she was also with Tommy during the time period he was purportedly executing the will and that he never left his home during such time. Additionally, Hampton, a document examiner, opined that the signatures on the 2016 Will and Trust Agreement that were allegedly Tommy's were not his signatures but were forgeries. Taken together, the Towery grandchildren maintained that material issues of fact were presented that precluded summary judgment.

By order entered May 23, 2019, the circuit court determined that defendants were entitled to partial summary judgment upon the claims of undue influence and mental capacity. As to undue influence, the circuit court concluded:

> None of the eight badges of undue influence are present in this case. Tommy was not unduly influenced in the execution of his will. When he executed his will, he was exercising his own judgment and his will is in accordance with his wishes. Plaintiff and Intervenors have not even "slight" evidence to show Tommy was unduly influenced in creating his will.

> Taking the evidence of record in the most favorable light to the Intervenors, this Court cannot find that any of the eight badges of undue influence are present. The Court agrees the Intervenors have presented insufficient evidence that Craig or Freda participated in any way in the preparation of Tommy's will, even

-25-

"slight" evidence. Based on the cases submitted by the Intervenors, their mere presence at the time of execution in of itself is insufficient to give rise to a claim of undue influence. They state that Craig "had the opportunity" to influence Tommy because of their close working relationship but offer no specific facts or instances to support that claim. Everyone, including the Intervenors, [Aundrea] and Dwayne, testified that Tommy was not easily influenced by anyone. They have presented no evidence either of them ever had the will in their possession. The fact that [Aundrea] was not listed as a beneficiary is not compelling as she had never been listed as a beneficiary in any of Tommy's estate documents. While Tommy did change the bequests to the Intervenors in the 2016 Will, he was aware of his relationship with them. . . . The Court finds the Intervenors (and the Plaintiff) have provided insufficient, insubstantial and not even slight evidence to show Tommy was unduly influenced in creating his will and therefore finds there are no genuine issues of material facts on this issue.

May 23, 2019, Order on Partial Summary Judgment at 20-21.

As to mental capacity, the circuit court decided:

The Intervenors (and Plaintiff) have the burden to show Tommy lacked testamentary capacity. This requires substantial proof, not remote or speculative evidence. Reviewing the facts in the most favorable light possible to the Intervenors, the Court can find no "substantial evidence" (or even slight) of lack of mental capacity or undue influence. The Court has reviewed and re-reviewed the depositions of [Aundrea], Dwayne, Kaileen and Kathryn Towery. Pertinent portions of their depositions have been set out above. In summary, they all testified that Tommy knew everyone around him and was able to carry on conversations; that he was still running Custom Engineering – he was "the Boss" and everyone knew it; that he continued to drive himself, make his own decisions and, even purchased a gun the

day prior to the 2016 Will, and he worked his puzzles. Their description of Tommy's deterioration in support of their claim of lack of capacity involved physical complications of his cancer and treatment rather than mental incompetency, i.e., his lack of appetite, fatigue, and diarrhea. The Intervenors offer no medical evidence in opposition to Tommy's treating physician, Dr. Stephens, who testified that Tommy was competent up to the last time he saw him in December 2016. Dwayne Towery, once [an] EMT and paramedic, testified that Tommy never looked like a "cancer patient – never lost his color." (D. Towery Depo. p. 93) The Intervenors claim Tommy was taking heavy pain medication around the time of the execution of the December 18, 2016 will but produced no evidence of same or what, if any effects it had upon him. Being physically incapacitated does not render one incompetent for purposes of executing one's will. As has been stated above, the requisites of mental capacity for executing a will are minimal.[]

Plaintiff and Intervenors have provided no evidence showing Tommy lacked the requisite mental capacity to execute his will. In fact, the deposition testimony shows quite the opposite. The evidence of record shows Tommy was mentally competent and still running Custom Engineering. The testimony establishes that Tommy knew the objects of his bounty and the character and value of his estate. It also confirms Tommy had an estate plan and his will distributed his estate in accordance with that plan. There is no genuine issue of material fact concerning Tommy's mental capacity to execute a will and Defendants are entitled to judgment as a matter of law on this issue.

May 23, 2019, Order on Partial Summary Judgment at 39-40.

The circuit court also granted defendants' motion for summary

judgment upon the issue of whether Tommy had, in fact, executed the 2016 Will

and Trust Agreement.  The circuit court believed that the Towery grandchildren's allegations failed to create a genuine issue of material fact:

> From a review of the record, the Court finds the Intervenors have not presented any affirmative evidence showing the existence of a genuine issue of material fact for trial; rather, they have only submitted their own affidavits relying on their own claims that the signatures on the 2016 Will and Trust are not James T. McCormick's.  Further, the Court finds that the testimony of the Plaintiff and Intervenor, Kaileen Towery, that they were with James T. McCormick during the period of time that he was reportedly executing his Will and Trust is not sufficient to overcome the unimpeached testimony of two attesting witnesses, an attorney and two eyewitnesses that were present when the decedent signed the questioned document. Intervenors have not provided the Court with any significant evidence demonstrating the existence of a genuine issue of material fact.  The Court further finds that due to the absence of any evidence, other than the statements of the Plaintiff and Intervenors, and the subsequent actions taken by James T. McCormick in which he followed up on the instructions given to him in a letter dated December 21, 2016[,] memorializing the events of December 18, 2016[,] by way of executing the James T. McCormick and Freda S. McCormick Irrevocable Family Trust on December 29, 2016, Defendants' argument that James T. McCormick signed the 2016 Will and Trust on December 18, 2016[,] in the presence of the aforementioned witnesses is only strengthened.  Lastly, the Court finds the testimony of Sharon Rose Hampton, Intervenors' document examiner, regarding her opinion on the genuineness of James T. McCormick's signature is not sufficient in this case to support the argument the will was forged due to the fact there is unimpeached eyewitness testimony and the signing of the will was made under circumstances that are not suspicious.  Although Ms. Hampton has been

-28-

found qualified to testify, due to the Court's findings herein, her testimony is rendered moot. The Court finds it is impossible for the Intervenors to produce evidence at trial warranting judgment in their favor, and based on the summary judgment standard set forth above, there are no genuine issues of material fact exist[ing] between the parties.

May 31, 2019, Amended Order at 10-11.

And, the circuit court rendered summary judgment dismissing Aundrea's and the Towery grandchildren's claims of tortious interference with inheritance and civil conspiracy. In so doing, the circuit court pointed out that Kentucky has not recognized the claim of tortious interference with inheritance.

The parties filed motions to amend or to vacate the orders granting defendants summary judgment. By order entered September 12, 2019, the circuit court corrected clerical errors but denied the motion to amend or vacate on other grounds.

The Towery grandchildren filed a notice of appeal (Appeal No. 2019-CA-1551-MR), Aundrea filed a notice of appeal (Appeal No. 2019-CA-1552-MR), and defendants filed a notice of cross-appeal (Cross-Appeal No. 2019-CA-1576-MR) in the Court of Appeals. We will address each appeal *seriatim*.

## 1. Testamentary Capacity

The Towery grandchildren contend that the circuit court erroneously rendered summary judgment upon the issue of Tommy's testamentary capacity to execute the 2016 Will. The Towery grandchildren point out that Tommy was undergoing chemotherapy for cancer at the time the will was executed on December 18, 2016. Citing to the affidavits of Freda and Tommy's mother, Pauline, the Towery grandchildren stress that Tommy was experiencing physical side effects from the treatments, including diarrhea, nausea, fatigue, weakness, and dehydration. Additionally, the Towery grandchildren cite the depositional testimony of Tommy's treating physician, Dr. Anthony Stephens, who stated that Tommy was aware of his poor prognosis and was taking numerous medications. The Towery grandchildren also point out that Tommy received chemotherapy on December 16, 2016, two days before he allegedly executed the 2016 Will and Trust Agreement. The Towery grandchildren also rely upon Kaileen's depositional testimony that Tommy was tired, was in severe pain, experienced diarrhea, and worked his Sudoku puzzles slower than usual during her visit in December 2016. Taken together, the Towery grandchildren maintain that material issues of fact exist as to Tommy's testamentary capacity to execute the 2016 Will, thus precluding entry of summary judgment.

Summary judgment is proper where there exists no genuine issue of material fact and movant is entitled to judgment as a matter of law. *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476 (Ky. 1991). Kentucky Rules of Civil Procedure (CR) 56.03. All facts and inferences therefrom are to be viewed in a light most favorable to the nonmoving party. *Steelvest, Inc.*, 807 S.W.2d 476. Effectively, our review in this case is *de novo*. *Cmty. Fin. Servs. Bank v. Stamper*, 586 S.W.3d 737, 741 (Ky. 2019). Our review proceeds accordingly.

It is well-established that to validly execute a will, the testator must possess testamentary capacity. *Getty v. Getty*, 581 S.W.3d 548, 554 (Ky. 2019). As to testamentary capacity, the Kentucky Supreme Court has meticulously set forth the law as follows:

> In Kentucky there is a strong presumption in favor of a testator possessing adequate testamentary capacity. This presumption can only be rebutted by the strongest showing of incapacity. *Williams v. Vollman*, 738 S.W.2d 849 (Ky. App. 1987); *Taylor v. Kennedy*, 700 S.W.2d 415, 416 (Ky. App. 1985). Testamentary capacity is only relevant at the time of execution of a will. *New v. Creamer*, 275 S.W.2d 918 (Ky. App. 1955). . . .
>
> "Kentucky is committed to the doctrine of testatorial absolutism." J. Merritt, 1 Ky. Prac.-*Probate Practice & Procedure*, § 367 (Merritt 2d ed. West 1984). *See New v. Creamer*, 275 S.W.2d 918 (Ky. 1955); *Jackson's Ex'r v. Semones*, 98 S.W.2d 505 (Ky. [1936]). The practical effect of this doctrine is that the privilege of the citizens of the Commonwealth to draft wills to dispose of their property is zealously guarded by the courts and will not be disturbed based on remote or

speculative evidence. *American National Bank & Trust Co. v. Penner*, 444 S.W.2d 751 (Ky. 1969). The degree of mental capacity required to make a will is minimal. *Nance v. Veazey*, 312 S.W.2d 350, 354 (Ky. 1958). The minimum level of mental capacity required to make a will is less than that necessary to make a deed, *Creason v. Creason*, 392 S.W.2d 69 (Ky. 1965), or a contract. *Warnick v. Childers*, 282 S.W.2d 608 (Ky. 1955).

　　　　To validly execute a will, a testator must: (1) know the natural objects of her bounty; (2) know her obligations to them; (3) know the character and value of her estate; and (4) dispose of her estate according to her own fixed purpose. *Adams v. Calia*, 433 S.W.2d 661 (Ky. 1968); *Waggener v. General Ass'n of Baptists*, Ky., 306 S.W.2d 271 (1957); *Burke v. Burke*, 801 S.W.2d 691 (Ky. App. 1990); *Fischer v. Heckerman*, 772 S.W.2d 642 (Ky. App. 1989). Merely being an older person, possessing a failing memory, momentary forgetfulness, weakness of mental powers or lack of strict coherence in conversation does not render one incapable of validly executing a will. *Ward v. Norton*, 385 S.W.2d 193 (Ky. 1964). "Every man possessing the requisite mental powers may dispose of his property by will in any way he may desire, and a jury will not be permitted to overthrow it, and to make a will for him to accord with their ideas of justice and propriety." *Burke v. Burke*, 801 S.W.2d 691, 693 (Ky. App. [1990]) (citing *Cecil's Ex'rs. v. Anhier*, 195 S.W. 837, 846 (Ky. 1917)).

*Bye v. Mattingly*, 975 S.W.2d 451, 454-56 (Ky. 1998).

　　　　To establish Tommy's lack of testamentary capacity, the Towery grandchildren point to Tommy's physical ailments (weakness, fatigue, diarrhea, nausea, pain, and dehydration), Tommy's inability to complete Sudoku puzzles as fast as he once did, Tommy's prescription medications (including pain medicine),

Tommy's poor prognosis, and aggressive cancer. However, none of the above facts demonstrate that Tommy lacked the testamentary capacity to execute the 2016 Will. Rather, the evidence uncontrovertibly established that Tommy possessed testamentary capacity to execute the 2016 Will.

The depositional testimony of both Kaileen and Aundrea affirm that Tommy knew and normally conversed with members of his extended family the day of and in the days before executing the 2016 Will. It was undisputed that Tommy contacted his attorney about the 2016 Will and Trust and dictated the terms thereof to her. Additionally, it is uncontroverted that Tommy was still working at Custom Engineering, was driving himself to chemotherapy treatments, and was shopping for Christmas presents in the days before executing the 2016 Will. Tommy's treating physician, Dr. Stephens, also testified that Tommy was mentally competent. After the 2016 Will and Trust Agreement were executed, Tommy had numerous assets transferred to the Trust.

The fact that Tommy was suffering from cancer and enduring the effects of its treatment does not disqualify him from executing a will. The Towery grandchildren have failed to introduce facts demonstrating that Tommy did not know his obligations to them, did not know his estate and its value, and did not dispose of his estate according to his wishes. *See Bye*, 975 S.W.2d at 456. We are mindful that our "courts guard [z]ealously the rights of all rational people,

-33-

including the aged, the infirm, the forgetful . . . , to make wills sufficient to withstand the attacks of those left out and those dissatisfied with the expressed desires of the departed, and this is still true where one child has been left out and all the other children remembered with benefits under the will." *Ky. Trust Co. v. Gore*, 192 S.W.2d 749, 752-53 (Ky. 1946). Accordingly, we conclude that the circuit court properly rendered summary judgment upon Tommy's testamentary capacity.

2. Undue Influence

The Towery grandchildren assert that the circuit court erroneously rendered summary judgment upon the issue of undue influence. The Towery grandchildren believe that issues of material fact preclude entry of summary judgment. Specifically, the Towery grandchildren point out that Craig was present when the 2016 Will and Trust Agreement were executed, which demonstrates Craig's participation in preparation of the 2016 Will and Trust Agreement. The Towery grandchildren also cite to the affidavits of Freda and Craig, who averred that Tommy was fearful of fighting cancer. The Towery grandchildren assert that Craig worked closely with Tommy and "had the opportunity to influence him [Tommy] on the decisions of Estate planning that would disinherit his sister's grandchildren and his sister." Towery grandchildren's Brief at 11. Additionally,

the Towery grandchildren emphasize that under Tommy's prior 2011 Will and Trust, they stood to inherit a minimum of $1,500,000.

It is recognized that "[u]ndue influence is a level of persuasion which destroys the testator's free will and replaces it with the desires of the influencer." *Bye*, 975 S.W.2d at 457. Undue influence is said to be inappropriate influence (threats, coercion, and similar acts) that operates to destroy the free will of the testator. *Id.* To demine if undue influence is present, the court must consider the following badges of undue influence:

> [A] physically weak and mentally impaired testator, a will which is unnatural in its provisions, a recently developed and comparatively short period of close relationship between the testator and principal beneficiary, participation by the principal beneficiary in the preparation of the will, possession of the will by the principal beneficiary after it was reduced to writing, efforts by the principal beneficiary to restrict contacts between the testator and the natural objects of his bounty, and absolute control of testator's business affairs.

*Bye*, 975 S.W.2d at 457.

In this case, there was no evidence presented that Craig or anyone else threatened or coerced Tommy. In fact, it was undisputed that Tommy was a strong-willed individual who never did anything he did not want to do. Although there was evidence that Tommy was fatigued and to some extent physically weak, it was undisputed that Tommy still drove, went to work at Custom Engineering, and shopped for Christmas presents during the relevant time period.

Although the Towery grandchildren claim the 2016 Will and Trust Agreement are unnatural, we are unable to agree. It is uncontroverted that Tommy wanted to provide for his wife, Freda, and wanted to protect her after his death. To effectuate his desires, Tommy placed the majority of his estate into trust for the benefit of Freda with Craig serving as trustee. Tommy devised his shares in Custom Engineering to Craig, as Craig had worked there his entire life. Additionally, there is no dispute that Tommy had been estranged from Aundrea even though they had reconciled.[2]

And, it cannot be said that Craig's and Freda's relationship with Tommy was short. Rather, Tommy and Freda had been married some 47 years. Craig was Tommy's son, and he had worked with Tommy at Custom Engineering.

The Towery grandchildren point out Craig was present when Tommy executed the 2016 Will and Trust Agreement. It is true that Craig was present; however, it is undisputed that Tommy requested Craig's presence that day and that Tommy signed the Trust Agreement as trustee. Freda was also present that day at the request of Tommy. Although both Craig and Freda were present for the execution, the evidence is uncontroverted that Tommy alone contacted his attorney and dictated the terms of the 2016 Will and Trust Agreement.

---

[2] In an Affidavit, Freda McCormick stated that she and Tommy suspected that Aundrea Towery had been using illegal drugs. Freda also stated that she and Tommy were upset with Aundrea for her failure to seek or maintain employment.

As to possession of the will, it is undisputed that Tommy's attorney had possession thereof, and there is no evidence that Freda or Craig attempted to restrict contact between Tommy and the Towery grandchildren or Aundrea. Finally, there is again no evidence that either Freda or Craig controlled Tommy's business affairs.

From our above analysis, we agree with the circuit court that no genuine issue of material fact existed as to undue influence and that summary judgment was properly rendered.

3. Tortious Interference with Inheritance

The Towery grandchildren maintain that the circuit court erroneously rendered summery judgment upon the claim of tortious interference with inheritance. We disagree.

In its summary judgment, the circuit court observed that Kentucky does not recognize the tort of interference with inheritance. The circuit court was correct. And, we decline to do so now. As a consequence, the court properly rendered summary judgment dismissing the tortious interference with inheritance claim.

1. Standing – Waiver

Aundrea contends that the circuit court erred by granting defendants' motion to dismiss her complaint for lack of standing to challenge the 2016 Will. Aundrea points out that defendants raised the defense of lack of standing in a motion to dismiss for failure to state a claim under CR 12.02. According to Aundrea, the motion to dismiss was only filed after Aundrea filed her amended complaint even though the defense of lack of standing existed at the time the original complaint was filed. As the defense of lack of standing was available after the original complaint was filed, Aundrea maintains that defendants waived the defense by not raising it in response to the original complaint.

To begin, defendants filed a motion to dismiss for failure to state a claim upon which relief could be granted under CR 12.02. Thereunder, a motion to dismiss is only granted if it appears the pleading party would not be entitled to relief under any facts that could be proved to support the claim. *McBrearty v. Ky. Cmty. & Tech. Coll. Sys.*, 262 S.W.3d 205, 211 (Ky. App. 2008).

In Kentucky, our Supreme Court has recognized that generally "only defenses which were not available in the first answer would be allowed in an

answer to an amended complaint." *United Bhd. of Carpenters v. Birchwood Conservancy*, 454 S.W.3d 837, 842 (Ky. 2014).[3]

Here, it is undisputed that the defense of lack of standing was available to defendants after the original complaint was filed and could have been raised in their original answer. While it is true that defendants generally raised the defense of dismissal for failure to state a claim in their original answer, it is, nevertheless, evident that defendants failed to particularly set forth any defenses as to lack of standing in the original answer. Rather, defendants only raised the defense of lack of standing in a motion to dismiss after the second amended complaint was filed. Under *United Brotherhood of Carpenters*, 454 S.W.3d at 842, we conclude that defendants waived the defense of lack of standing by failing to raise it after the original complaint was filed. We, thus, hold that the circuit court committed reversible error by determining that Aundrea lacked standing to challenge the 2016 Will. As a consequence, we reverse the circuit court's order of dismissal based upon Aundrea's lack of standing and remand for proceedings consistent with this Opinion. This Opinion takes no position on any claims asserted by Aundrea in regards to the will other than what is discussed below.

---

[3] In *United Brotherhood of Carpenters v. Birchwood Conservancy*, 454 S.W.3d 837, 842 (Ky. 2014), the defenses at issue were lack of capacity to be sued and/or lack of standing.

2.  Tortious Interference with Contract

Aundrea also argues that the circuit court erred by rendering summary judgment dismissing her claim for tortious interference with contract.  In the companion appeal (Appeal No. 2019-CA-1551-MR) filed by the Towery grandchildren, we held that the circuit court properly dismissed the claim based upon tortious interference with inheritance as Kentucky does not recognize the tort.  For this reason, we, likewise, view Aundrea's argument to be without merit and conclude the circuit court did not err by rendering summary judgment dismissing the claim of tortious interference with contract.

We view any remaining contentions of error to be moot or without merit.

CROSS-APPEAL NO. 2019-CA-1576-MR

1.  Expert Opinion

Appellees/Cross-Appellants (appellees) assert that the circuit court erred by denying their motion to exclude the expert opinion of Sharon Rose Hampton.  Appellees state that Aundrea and the Towery grandchildren sought to rely upon the expert opinion of Hampton, a document examiner, who opined that the signature on the 2016 Will and Trust Agreement was not Tommy's signature.  Appellees claim that Hampton is not qualified to render an expert opinion and her depositional testimony is not supported by reliable methods.  In particular,

appellees maintain that Hampton does not meet the basic training requirements of a document examiner and her opinion is unreliable because she failed to examine the original 2016 Will.

Kentucky Rules of Evidence (KRE) 702 is related to admissibility of expert opinion testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;
>
> (2) The testimony is the product of reliable principles and methods; and
>
> (3) The witness has applied the principles and methods reliably to the facts of the case.

And, the Kentucky Supreme Court has set forth our standard of review:

> In making the decision to admit or exclude expert testimony under *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993),*] the trial court must decide whether the testimony is reliable, a factual determination, and whether the testimony will assist the trier of fact in understanding or determining a fact in issue, an admissibility determination. *Miller v. Eldridge*, 146 S.W.3d 909, 915 (Ky. 2004). These two decisions are reviewed under different standards. *Id.* We review the trial court's factual findings regarding reliability for clear error, while we review the trial court's decision regarding admissibility for abuse of discretion. *Id.* A factual

finding is clearly erroneous if it is not supported by "'evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable [persons].'" *City of Fort Thomas v. Cincinnati Enquirer*, 406 S.W.3d 842, 854 (Ky. 2013) (citing *Owens-Corning Fiberglas Corporation v. Golightly*, 976 S.W.2d 409, 414 (Ky. 1998)). However, a trial court abuses its discretion only if its decision "'was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.'" *Miller*, 146 S.W.3d at 914 (footnote omitted).

*Oliphant v. Ries*, 460 S.W.3d 889, 897 (Ky. 2015).

In determining that Hampton qualified as an expert in document examination, the circuit court determined:

The Court has thoroughly reviewed Ms. Hampton's resume and certification records. Regarding Ms. Hampton's qualifications, the Rules of Evidence do not require a four-year degree. Ms. Hampton testified that she has been unable to be certified by the American Board of Forensic Document Examiners due to her only having received an associate degree and not a bachelor's degree. Mr. Sperry admitted there are document examiners out there that do not have a four-year degree that have been accepted by the Court. Mr. Sperry further testified that not having a four-year degree would not disqualify anyone from testifying in and of itself and that an individual could have a four-year degree in "basket-weaving" but if they do not have the training for the two-year period of time, then they do not meet the standards. Mr. Sperry admitted there are no state certifying bodies in any state that certify forensic document examiners. Regarding Ms. Hampton's methodology, Ms. Hampton admitted that she did not examine the original will in this case. However, Mr. Sperry admitted that not examining the original is not an error in and of itself because "we deal with copies all of the time." Mr. Sperry did not take

issue with the number of documents Ms. Hampton reviewed in this case and when asked if he uses the same techniques and methodology she listed in her affidavit in assessing whether a signature is genuine, Mr. Sperry responded "all of those things we use."

May 23, 2019, Order at 9-10.

Upon the whole, we do not believe the circuit court's finding that Hampton's expert opinion was reliable to be clearly erroneous or admission of Hampton's expert opinion to be an abuse of discretion. *See id.* In short, we are of the opinion that the circuit court did not commit reversible error by denying appellees' motion to exclude Hampton's expert opinion.

2. Effect of Reversal

Appellees' last argument on cross-appeal is somewhat unusual. Specifically, they argue:

Should this Court overturn the Webster Circuit Court's Order on standing, [Aundrea]'s will contest claims nonetheless fail because they are factually unsupportable. Although the Circuit Court held early in the case that [Aundrea] had no standing to pursue her will contest claims, she and her counsel continued to fully and actively participate in the case because of her other claims. After full discovery, the Webster Circuit Court granted the McCormicks Summary Judgment on all will contest claims. But the Circuit Court then abused its discretion in partially granting [Aundrea]'s motion to amend, holding that Summary Judgment do [sic] not apply to [Aundrea]. There is no genuine dispute of material fact so, as a matter of law, the will contest claims cannot proceed. It would be a waste of judicial resources and case unnecessary and unwarranted delay to

-43-

return to the Circuit Court when [Aundrea] has already had the opportunity to present evidence in support of her claims and has failed to do so.

. . . .

In short, regardless of who is bringing the will contest claims – [Aundrea] or her children – the evidence remains the same. [Aundrea] did not argue that with additional time or opportunity she would or could have submitted different or additional evidence. There are no genuine issues of material fact that Tommy had the requisite mental capacity to execute in 2016 Will, that Tommy was not unduly influenced, and that Tommy validly signed and executed his 2016 Last Will.

January 22, 2021, Combined Brief for Appellees/Cross-Appellants at 21-22 (footnote and citation omitted).

This Court is an appellate body, and our task is to review errors committed by lower courts. The circuit court has not ruled upon Aundrea's will contest claims, and as a result, it is premature and improper for this Court to do so. *See Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 734 (Ky. 2009).

For the foregoing reasons, we affirm Appeal No. 2019-CA-1551-MR and affirm in part, reverse in part, and remand Appeal No. 2019-CA-1552-MR for proceedings consistent with this Opinion. We also affirm Cross-Appeal No. 2019-CA-1576-MR.

ALL CONCUR.

-44-

BRIEFS FOR APPELLANTS/
CROSS-APPELLEES KATHRYN
TOWERY, KAILEEN TOWERY,
AND DWAYNE A. TOWERY, AS
NEXT-OF-FRIEND OF KOLBY
TOWERY:

J. Keith Cartwright
Madisonville, Kentucky

BRIEFS FOR APPELLANT
AUNDREA L. TOWERY:

Lara R. Hunt
Madisonville, Kentucky

Daniel N. Thomas
Hopkinsville, Kentucky

BRIEF FOR APPELLEES/CROSS-
APPELLANTS CRAIG T.
McCORMICK, IN HIS CAPACITY
AS EXECUTOR OF THE ESTATE
OF JAMES T. McCORMICK,
DECEASED; CRAIG T.
McCORMICK, AS TRUSTEE OF
THE JAMES T. McCORMICK
REVOCABLE LIVING TRUST;
CRAIG T. McCORMICK,
INDIVIDUALLY; FREDA S.
McCORMICK, INDIVIDUALLY;
AND ALLISON McCORMICK,
INDIVIDUALLY:

Brucie W. Moore
Megan Randolph
Morganfield, Kentucky

Kevin C. Burke
Jamie K. Neal
Louisville, Kentucky